**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **LEXON INSURANCE COMPANY, INC.,** | |
| *Plaintiff,* | **CIVIL ACTION NO. 2:18-CV-4245** |
| **v.** | |
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver for First NBC Bank, New Orleans, LA,** | **JUDGE IVAN L.R. LEMELLE** |
| *Defendant.* | **MAGISTRATE JUDGE JANIS VAN MEERVELD** |

<u>**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**</u>

<u>**May It Please the Court:**</u>

The Federal Deposit Insurance Corporation's ("<u>FDIC</u>") Motion to Dismiss ("<u>Motion</u>") Lexon Insurance Company, Inc.'s ("<u>Lexon</u>" or "<u>Plaintiff</u>") claims should be denied for the following reasons:

- The correct standard of review of Plaintiff's claims is *de novo*, not abuse of discretion as contended by the FDIC;

- Whether the FDIC has repudiated a contract within a "reasonable period" calls for a fact-specific inquiry that is not readily reducible to a number of days calculation, and the allegations in the Complaint, taken as true, require further development of the factual record;

- Where the FDIC does not properly repudiate a contract pursuant to 12 U.S.C. § 1821(e), damages under the contract are not subject to 1821(e)'s actual direct compensatory damages limitation, and Plaintiff is entitled to full contract damages;

- Irrevocable letters of credit are not contracts or leases and therefore may not be repudiated under § 1821(e); and

- Because the FDIC does not oppose Plaintiff's second and fourth causes of action, there is no reason why those causes of action should not proceed.

1

## SUMMARY OF ARGUMENT

Plaintiff Lexon Insurance Company, Inc. ("Plaintiff" or "Lexon") brings this action against the Federal Deposit Insurance Corporation ("Defendant" or "FDIC") for damages of $9,985,500.00 resulting from the FDIC's failure to honor, and improper repudiation of, two irrevocable letters of credit issued by First NBC ("FNBC" or the "Bank"). The irrevocable letters of credit were posted as collateral to secure Lexon in connection with eight performance bonds (the "Bonds") issued for a total penal sum of $11,163,300.00 on behalf of Linder Oil Company ("Linder") as principal.[1]  On July 2, 2018, the FDIC moved to dismiss Lexon's Complaint (the "Motion").  Lexon submits this Memorandum of Law in opposition.

The FDIC's Motion fails for a host of reasons.  To start, the FDIC applies the wrong standard of review.  The correct standard of review is *de novo*, not abuse of discretion as contended by the FDIC.  *See* 12 U.S.C. § 1821(d)(6)(A)(ii); *Placida Prof'l Ctr., LLC v. FDIC*, 512 F. App'x 938, 945 (11th Cir. 2013).

Second, the caselaw is clear – determining whether the FDIC has repudiated a contract within a "reasonable period" calls for a fact-specific inquiry that is not readily reducible to a calculation of the number of days.  Thus, the FDIC's attempt to reduce this case to nothing more than a counting exercise is unsupported and unpersuasive.  Indeed, even the case the FDIC relies upon, *Building Four Shady Oaks Management, L.P. v. FDIC*, 504 Fed. App'x. 292 (5th Cir. 2012), was decided *after the FDIC's motion for summary judgment on this very issue was denied*, and *after a bench trial* because, in the words of the Fifth Circuit, "[t]he only way to determine whether an action's timing is reasonable is to consider it in light of the surrounding circumstances."  *Id*. at 295.

---

[1] At the time the Bonds were issued, Linder was a substantial FNBC borrower that owed over $100 million to FNBC.  Compl. ¶¶ 2, 28-30.

Third, the FDIC misapplies the law with respect to damages.  The Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") limits the universe of available damages *only where the FDIC properly repudiates a contract* pursuant to 12 U.S.C. § 1821(e).  In the event the FDIC improperly repudiated a contract (which, of course, is a fact-specific inquiry), a party is entitled to recover all of its damages, not just the limited damages set forth under § 1821(e).  *See* 12 U.S.C. § 1821(e)(3)(A); *NCB Mgmt. Servs., Inc. v. FDIC*, 843 F. Supp. 2d 62, 69–70 (D.D.C. 2012).  The amount of those damages may be established *after* the parties have conducted factual discovery.  *See NCB Mgmt. Servs., Inc.*, 843 F. Supp. 2d at 69–70 (holding that "[a]t [the pleadings] stage," a plaintiff "need not plead with particularity damages that would typically be expected to flow from its claims"); *Citibank (S. Dakota), N.A. v. FDIC*, 827 F. Supp. 789, 791 (D.D.C. 1993).

Fourth, Lexon's third cause of action states a plausible claim because the irrevocable letters of credit are not contracts or leases, and therefore may not be repudiated under § 1821(e).  *See generally* UCC § 5-102(a)(10); *Ward Petroleum Corp. v. FDIC*, 903 F.2d 1297, 1300 (10th Cir. 1990); *Bank of Cochin Ltd. v. Manufacturers Hanover Tr. Co.*, 612 F. Supp. 1533, 1537 (S.D.N.Y. 1985), *aff'd*, 808 F.2d 209 (2d Cir. 1986); Complaint ("Compl.") ¶¶ 105-08 (same).

Finally, the FDIC does not oppose Plaintiff's second and fourth causes of action and, as such, there is no reason why those causes of action should not proceed.  *NCB Mgmt. Servs., Inc.*, 843 F. Supp. 2d at 71; *Accardi Endeavors, LLC v. FDIC*, No. 8:10–cv–839–T–26EAJ, 2010 WL 3123085, at *4 (M.D. Fla. Aug. 9, 2010); Compl. ¶¶ 88-97, 111-21.

## STATEMENT OF FACTS

In March 2016, Lexon, as surety, executed eight performance bonds for a total penal sum of $11,163,300.00 on behalf of Linder Oil Company.[2]  Compl. ¶ 11, Ex. A.  It is hornbook law that in any suretyship relationship, the principal (Linder) is primarily liable and the surety is secondarily liable and entitled to be indemnified by the principal in the event it suffers a loss.  To fulfill this indemnification obligation, and as an underwriting condition before issuing the Bonds, Lexon required Linder to post collateral which it would hold until either (1) its liability under the Bonds was released or (2) it determined in its sole judgment, it needed to draw on the irrevocable letters of credit for its protection because a claim may be made under the Bonds.  To fulfill this condition before the Bonds were issued, in late March and early April, FNBC issued two irrevocable letters of credit on Linder's application, for which Lexon was beneficiary.  *Id.* ¶ 14, Ex. B.  Each of the irrevocable letters of credit provided that Lexon could draw on them if, in its sole judgment, it needed to draw on the irrevocable letters of credit for its protection because a claim may be made under the Bonds.  *Id.* ¶¶ 16, 17.  The irrevocable letters of credit automatically renewed in March 2017 for an additional year through March 2018 when FNBC, under the FDIC's control, did not send a notice of nonrenewal to Lexon.  *Id.* ¶¶ 18, 20.

In 2016, after an examination of FNBC, the FDIC concluded that it was suffering from significant asset quality deterioration with substantial risk management weaknesses and high risk debtors, and required more hands-on oversight.  *Id.* ¶¶ 24, 30.  Linder was one of its most risky borrowers, overleveraged to FNBC for $117 million.  *Id.* ¶ 29.  FNBC's financial well-being continued to deteriorate throughout 2016.  *Id.* ¶¶ 31-37.  In November 2016, the FDIC forced FNBC to execute a Consent Order that gave the FDIC total control over the Bank and established

---

[2] Although Plaintiff respectfully refers the Court to the Complaint itself (and the exhibits thereto) for the facts relevant to this Motion, for the convenience of the Court, Plaintiff sets forth a substantially abridged version of those facts here.

itself as principal and FNBC as its agent.  Despite the FDIC's total control over the Bank and requirements that it cease lending to borrowers like Linder, the FDIC, via FNBC, permitted the irrevocable letters of credit to renew in March 2017—a clear violation of the Consent Order. *Id.* ¶¶ 42, 45, 46, 49.  During the final quarter of 2016 through the first quarter of 2017, FNBC continued to financially deteriorate, and Louisiana officials finally closed the Bank on April 28, 2017, officially appointing the FDIC as receiver.  *Id.* ¶ 56.

Unbeknownst to Lexon, beginning in late 2016 (prior to FNBC's closure) through September 2017 (more than five months after FNBC's closure), FNBC and the FDIC worked to financially prop up Linder.  *Id.* ¶ 64.  Initially, the FDIC sought to keep Linder's creditors at bay, but the two sides ultimately focused on a plan for Linder to enter bankruptcy with debtor-in-possession ("DIP") financing from the FDIC.  *Id.*  As a part of this plan, the FDIC agreed not to repudiate Lexon's irrevocable letters of credit because without them, Linder would not have a source of bonding and therefore could not continue its operations.  *Id.* ¶ 65.  If Lexon had known about Linder's true precarious financial condition, Lexon would have drawn on the irrevocable letters of credit.  *Id.* ¶ 67.  Ultimately, after months of negotiating with Linder and using the irrevocable letters of credit as a bargaining chip, the FDIC purported to repudiate the irrevocable letters of credit in late September 2017, well beyond any reasonable period of time after its appointment.  *Id.* ¶¶ 66, 69.

Believing that the FDIC's purported repudiation was legally ineffective, Lexon sent the FDIC drafts against the irrevocable letters of credit on December 1, 2017.  *Id.* ¶ 70.  The FDIC never responded to Lexon's drafts as it was required to do under the UCC and the Uniform Customs and Practice for Documentary Credits.  On December 21, 2017, Lexon filed proofs of

claim in connection with the irrevocable letters of credit, but they were denied on February 26, 2018. *Id.* ¶¶ 71-72.

## LEGAL STANDARD

"Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted.  Such a motion is rarely granted because it is viewed with disfavor." *Alfasigma USA, Inc. v. EBM Med., LLC*, No. CV 17-7753, 2018 WL 1604961, at *2 (E.D. La. Apr. 3, 2018) (Lemelle, J.) (citing *Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997)).

"When reviewing a motion to dismiss, courts must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party." *Id.* (citing *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996)).  "Upon identifying the well-pleaded factual allegations, courts 'assume their veracity and then determine whether they plausibly give rise to an entitlement of relief.'" *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949).  "This is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949).  Plaintiffs must merely "nudge their claims across the line from conceivable to plausible." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

# ARGUMENT

## POINT I

### THE FDIC PROPOSES THE
### WRONG STANDARD OF REVIEW

The FDIC erroneously claims that the Court's review of the Proofs of Claim is subject to abuse of discretion review. Mot. at 7. The FDIC is wrong. Pursuant to 12 U.S.C. § 1821(d)(6)(A)(ii), the Court has *de novo* jurisdiction to consider Lexon's claims set forth in the Proofs of Claim. As Section 1821(d)(6)(A) provides, once the FDIC has issued a notice of disallowance, a party may request administrative review or file suit in a federal district court. Courts have repeatedly held that claims of parties filing suit in federal district court are subject to *de novo* review, not abuse of discretion. *See, e.g.*, *Meliezer v. Resolution Trust Corp.*, 952 F.2d 879, 882 (5th Cir. 1992) (district court review of administrative claims is de novo); *Placida Prof'l Ctr., LLC v. FDIC*, 512 F. App'x 938, 945 (11th Cir. 2013) ("We conclude the district court had subject matter jurisdiction over Placida's declaratory judgment claim under § 1821(d)(6), which provides for *de novo* judicial review of claims that have gone through § 1821(d)'s administrative claims process. (citing 12 U.S.C. § 1821(d)(6)(A)(ii)."); *Bank of America v. Colonial Bank*, 604 F.3d 1239, 1244 (11th Cir. 2010) (district court review of administrative claims *de novo*).[3]

---

[3] *See also, e.g.*, *Office & Prof'l Employees Int'l Union, Local 2 v. FDIC*, 962 F.2d 63, 65 (D.C. Cir. 1992) ("FIRREA is strict in its demand that claimants first obtain an administrative determination. Congress was concerned, however, about the constitutionality of entrusting to executive agency adjudication claims that ordinarily lie within the province of the courts. Accordingly, Congress instructed district courts to "determine" claims against failed banks *de novo*, rather than merely to review, for error or abuse, FDIC's initial decisions." (footnote omitted)); *Winkal Mgmt., LLC v. FDIC*, 288 F. Supp. 3d 33, 40 (D.D.C. 2017) ("Assuming the jurisdictional prerequisites are met, courts review FIRREA damages claims *de novo*."); Compl. ¶ 75.

The FDIC's cases do not support the FDIC's contention that federal courts review for abuse of discretion.  In support of its contention, the FDIC cites *Qi v. FDIC*, 755 F. Supp.2d 195, 201 (D.D.C. 2010); *Resolution Trust Corp. v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446, 1455 (8th Cir. 1992); and *McCarron v. F.D.I.C*, 111 F.3d 1089, 1094 (3d Cir. 1997).  Neither *Qi* nor *CedarMinn* state *anything* about the standard of review of a disallowed claim in federal court.  In *McCarron*, the court explained that the FDIC's repudiation decision will not be overturned absent an abuse of discretion, but the discussion was in the context of whether the FDIC properly concluded that the contract was burdensome, which is consistent with the language of the statute. *See* 12 U.S.C. § 1821(e)(1)(B) (providing FDIC may repudiate contract or lease where "the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome").  In the very next sentence, the *McCarron* court noted that beyond whether the FDIC determined in its discretion that the contract was burdensome, it *must* repudiate within a "reasonable period."  *See McCarron*, 111 F.3d at 1094.  Thus, Defendant confuses the language in *McCarron* and, as a result, applies the wrong standard of review to its motion.

## POINT II

### LEXON'S FIRST CAUSE OF ACTION STATES A PLAUSIBLE CLAIM FOR RELIEF BECAUSE THE FDIC IMPROPERLY REPUDIATED THE IRREVOCABLE LETTERS OF CREDIT PURSUANT TO 12 U.S.C. § 1821(e)

**1. The FDIC Did Not Repudiate the Irrevocable Letters of Credit Within a Reasonable Period Following Their Appointment**

According to the FDIC, it properly repudiated the irrevocable letters of credit because it took around the same length of time to repudiate another agreement which the Fifth Circuit upheld as proper in *Building Four Shady Oaks Management, L.P. v. FDIC*, 504 Fed. App'x. 292 (5th Cir. 2012).  *See* Mot. at 11-12.  The FDIC's analysis literally starts and stops with the

8

counting of days (153 versus 157 days).  In making this argument, the FDIC completely ignores a wealth of caselaw, including its own cited cases, holding that a "reasonable period" calls for a fact-specific inquiry that is not readily reducible to abstract formulations or calculations.

Courts have repeatedly held that whether repudiation occurred within a reasonable time is not attributable to the number of days the FDIC took, but to an analysis of the facts and circumstances on a case-by-case basis.  *See, e.g.*, *Burnett Plaza Assocs. v. NCNB Texas Nat. Bank*, No. 3:89-CV-1290-X, 1994 WL 932184, at *25 (N.D. Tex. May 12, 1994) (holding FDIC's months long delay breached lease because it did not repudiate lease within reasonable period of time, explaining, among other things, FDIC delayed repudiation to permit bank to continue its efforts to pressure plaintiff into accepting its ultimatum on lease); *see also Vill. Park Office I, LLC v. FDIC*, No. 3:11-CV-182 CDL, 2013 WL 1296360, at *1, *3 (M.D. Ga. Mar. 26, 2013) (denying FDIC motion for summary judgment, concluding circumstances of case establish genuine fact dispute as to whether FDIC repudiated lease within reasonable time of appointment as receiver); *Cent. Buffalo Project Corp. v. FDIC*, 29 F. Supp. 2d 164, 170 (W.D.N.Y. 1998) (concluding roughly 100–day delay before repudiation was not within reasonable period where evidence suggested no reason why leases could not have been repudiated at much earlier date).

Thus, the FDIC misapplies and oversimplifies the Fifth Circuit's decision in *Building Four*.  Unlike here, the decision in *Building Four* did not involve a pre-answer motion to dismiss.  Rather, the Fifth Circuit affirmed dismissal after a full bench trial.  A bench trial was necessary because the Court needed evidence on the facts and circumstances surrounding the FDIC's repudiation of a contract after waiting 157 days.  504 Fed. App'x. at 295 ("whether a given period of time is reasonable necessarily depends on the surrounding facts and circumstances" (citing *Alford v. United States*, 709 F.2d 418, 424 n.9 (5th Cir. 1983)); *see also*

*Resolution Trust Corp. v. CedarMinn Building Ltd. Partnership.* 956 F.2d 1446, 1455 (8th Cir. 1992) ("The amount of time that is reasonable must be determined according to the circumstances of each case.").  Indeed, at the trial court level, the FDIC had already filed – and lost – a motion for summary judgment that argued, among other things, that the 157 days was reasonable as a matter of law despite admitting that "courts have consistently held that what constitutes a 'reasonable period' depends on the particular circumstances of each case." Defendants FDIC Motion for Summary Judgment at 10, *Building Four Shady Oaks Management LP v. FDIC*, No. 3:10-cv-00970 (N.D. Tex. May 20, 2011), ECF No. 45.  The district court denied the motion on the grounds that there were genuine disputes as to material facts.  Order, *Building Four Shady Oaks Management LP v. FDIC*, No. 3:10-cv-00970 (N.D. Tex. July 7, 2011), ECF No. 65.

Here, the FDIC asks this Court to ignore the above caselaw and skip the necessary factual analysis.  In doing so, the FDIC casually claims that a 153-day delay is *per se* reasonable, while offering no explanation whatsoever for its delay.  This is because the FDIC actually saw the irrevocable letters of credit as having value—to be used as a bargaining chip—in its negotiations with one of the Bank's most risky borrowers.  If the facts alleged in Lexon's Complaint are presumed true (as they must), a fact-specific inquiry by the Court is warranted.  *See Alfasigma USA, Inc. v. EBM Med., LLC*, No. CV 17-7753, 2018 WL 1604961, at *2 (E.D. La. Apr. 3, 2018) (Lemelle, J.).  Among other facts, the Court must presume the following facts alleged in the Complaint as true for purposes of this Motion:

- The FDIC knew of the existence of the irrevocable letters of credit throughout 2016, beginning with its examination of FNBC through to the signing of the November 2016 Consent Order.  Compl. ¶ 63.

- In January 2017, when FNBC, acting under the FDIC's dominion and control, did not give timely notice of nonrenewal of the irrevocable letters of credit, the FDIC

(in clear violation of the Consent Order) permitted the automatic renewal of the irrevocable letters of credit through March 2018. *Id.*[4]

- After its appointment as receiver for FNBC, the FDIC elected not to promote the orderly administration of FNBC's affairs by repudiating the irrevocable letters of credit. Instead, the FDIC elected to purposely and unreasonably delay repudiation of the irrevocable letters of credit to Lexon's prejudice in order to string them along as a bargaining chip for its negotiations with Linder over the oil company's more than $100 million in obligations to the Bank. *Id.* ¶¶ 63, 68.

- Shortly after its appointment as receiver for FNBC at the end of April 2017, the FDIC offered to advance funds to Linder to pay creditors, but, by September 2017, the FDIC and Linder's tentative plan evolved and instead provided for a sum of $400,000.00 of DIP financing to fund Linder's operations as it prepared to enter bankruptcy. *Id.* ¶¶ 64, 65. As part of this proposal, Linder required that the FDIC not repudiate the irrevocable letters of credit, which would permit the oil company to continue to operate while in bankruptcy. *Id.* ¶ 65.

- Any "rescue" of Linder would require a continued line of bonding and the FDIC knew that the irrevocable letters of credit were critical to bonding and Linder's OCS operations, and so it delayed repudiating them. *Id.* ¶ 68.

- By late September 2017, the FDIC elected not to provide DIP financing to Linder and, shortly thereafter, repudiated the irrevocable letters of credit. *Id.* ¶ 66.

- Before the FDIC repudiated the irrevocable letters of credit, Lexon had heard nothing from the FDIC regarding them and, if it had, it would have drawn on the irrevocable letters of credit. *Id.* ¶ 67. *See generally id.* ¶ 69.

Clearly, the FDIC did not see the irrevocable letters of credit as a burden or that they needed to be repudiated for the orderly administration of FNBC's affairs. Instead, the FDIC chose to delay repudiation while it engaged in an asset resolution strategy (the DIP credit facility) that leveraged its repudiation power to Lexon's prejudice. In doing so, it delayed repudiation for an unreasonable period of time. *See Burnett Plaza*, 1994 WL 932184, at *25; *see also Trinity Town Ctr., LLP v. FDIC*, No. 813-CV-370-T-30AEP, 2013 WL 3461926, at *4 (M.D. Fla. July 9, 2013) (denying motion to dismiss and concluding plaintiffs adequately alleged

---

[4] If the FDIC had notified Lexon that the irrevocable letters of credit were not being renewed, Lexon would have learned of FNBC's precarious financial position and would have properly drawn on the irrevocable letters of credit, thereby avoiding the need for this lawsuit.

that FDIC did not repudiate Lease within reasonable period of time); *Vill. Park Office*, 2012 WL 1424507, at *3; *Cent. Buffalo Project*, 29 F. Supp. 2d at 170.

At the very least, whether the FDIC's repudiation was within a reasonable period of time requires further development of the factual record. *See, e.g.*, *NCB Mgmt. Servs., Inc. v. FDIC*, 843 F. Supp. 2d 62, 71 (D.D.C. 2012) (declining to dismiss case where FDIC waited six and a half months to repudiate contract because question of whether FDIC's attempted repudiation was effective "must await further development of the factual record"); *Accardi Endeavors, LLC v. FDIC*, No. 8:10–cv–839–T–26EAJ, 2010 WL 3123085, at *4 (M.D. Fla. Aug. 9, 2010) (denying motion to dismiss because "question of reasonableness is a factual dispute best left for a determination on the merits at a different stage in the proceedings"); *see also 701 NPB Assocs. v. FDIC*, 779 F. Supp. 1336, 1339 (S.D. Fl. 1991) (denying motion to dismiss where FDIC waited six months to repudiate lease because "what constitutes a reasonable time" is fact sensitive and "must occur on a case by case basis"). Accordingly, this Court should reject the FDIC's argument that 153 days is a reasonable time as a matter of law.

## 2. Lexon's Damages Are Not Limited to Actual Direct Compensatory Damages Because the FDIC Did Not Effectively Repudiate the Irrevocable Letters of Credit

The FDIC contends that 12 U.S.C. § 1821(e)(3)(A) limits Lexon's damages for repudiation to actual direct compensatory damages determined at the date of appointment. Mot. at 8-9. As the statute plainly provides, actual direct compensatory damages are strictly "*for* the disaffirmance or repudiation of any contract *pursuant to paragraph (1)*" of Section 1821(e) (authority to repudiate contracts).

Thus, if the FDIC did not repudiate a contract in compliance with § 1821(e), and it has not, Lexon is *not* limited to actual direct compensatory damages pursuant to § 1821(e), and

normal contract law damages would apply.  As explained in *NCB Management Services, Inc. v. FDIC*:

> As NCB observes, "[t]he FDIC must make the determination whether or not to repudiate a contract within a 'reasonable period' following [its] appointment as receiver."  Determining whether the FDIC has repudiated a contract within a "reasonable period" calls for a fact-specific inquiry that is not readily reducible to abstract formulations or principles. . . . The Court does not doubt that the FDIC has broad authority to repudiate agreements under FIRREA.  Still, that authority must be exercised within the parameters set by Congress.  Whether the FDIC's attempted repudiation on October 5, 2010 was effective cannot be resolved at this procedural posture and must await further development of the factual record.  Further, whether NCB is entitled to damages, and what form those damages might take, are questions that turn on whether the FDIC properly exercised its power of repudiation.

843 F. Supp. 2d at 69–70 (first and second alterations in original) (citations and footnote omitted).[5]  Thus, like *NCB Management Services*, the form and measure of Lexon's damages are questions that turn on whether the FDIC properly repudiated the irrevocable letters of credit.  That is a fact-specific inquiry that must await further development of the factual record.

The FDIC further argues, citing a single case, that any actual direct compensatory damages must be due and owing based upon the § 1821(e) language "determined as of the date of appointment."  For the FDIC, this language implies that if Lexon had not suffered damages on the date of the FDIC's appointment, then the FDIC is not liable for any damages after its appointment even if it repudiates an agreement.  Mot. at 9-10 (citing *Citibank (S. Dakota), N.A. v. FDIC*, 827 F. Supp. 789, 791 (D.D.C. 1993)).  Again, the FDIC's conclusion is not only wrong, but it is illogical.  *See, e.g.*, *FDIC v. Randa Investments, Ltd*, No. 09-CV-263-D, 2011

---

[5] *See, e.g.*, *Country Club Assocs. Ltd. P'ship v. FDIC*, 918 F. Supp. 429, 437 (D.D.C. 1996) (observing that failure to properly repudiate contract "results in a continuation of the contractual obligation and the application of contractual principles to the dispute"); *see also Burnett Plaza Assocs.*, No. 3:89-CV-1290-X, 1994 WL 932184, at *19 (N.D. Tex. May 12, 1994) (concluding where "FDIC as Receiver does not repudiate a lease within a reasonable period of time, the FDIC has assumed the lease and the other party is entitled to . . . full contract damages (unpaid future rent) upon a subsequent breach of the lease.").

WL 13112223, at *4 (D. Wyo. Jan. 27, 2011) ("The fact that any damages flowing from a breach of that agreement did not actually arise until the FDIC repudiated the contract and refused to make further loan advances does not take the damages out of the realm of compensable damages under § 1821(e)(3).  A contrary result would make the FDIC immune from virtually all damages arising from repudiated contracts.").

In truth, "[d]amages are fixed and determined on the date of receivership where 'the contractual right at issue vested prior to the appointment of the FDIC as receiver.'"  *See, e.g.*, *Citibank (S. Dakota)*, 827 F. Supp. at 791.  "A contractual right is sufficiently vested where the insolvent bank's promise was binding and enforceable under contract law at the time of the appointment of the receiver."  *Nashville Lodging Co. v. Resolution Tr. Corp.*, 59 F.3d 236, 244 (D.C. Cir. 1995) (internal quotation marks omitted); *see Office & Prof'l Employees Int'l Union, Local 2 v. FDIC*, 27 F.3d 598, 602 (D.C. Cir. 1994).  "Therefore, as long as the contractual right existed on the date of receivership, the liability is sufficiently fixed and certain to be provable against the FDIC at the moment the FDIC became the receiver."  *Navarro v. FDIC*, 371 F.3d 979, 982 (7th Cir. 2004).[6]

Thus, even if Lexon's damages were subject to Section 1821(e), and they are not, Lexon's contractual rights were vested in January 2017 and were fixed and determined as of April 2017, the date of the FDIC's appointment as receiver.  *See Navarro*, 371 F.3d at 982; *Randa Investments, Ltd*, 2011 WL 13112223, at *4; *Citibank (S. Dakota)*, 827 F. Supp. at 791. As alleged in the Complaint, the irrevocable letters of credit automatically renewed in March

---

[6] Moreover, as other courts have explained in cases where the FDIC advanced the argument, "the FDIC's argument is based on a misreading of pre-FIRREA banking law that has largely been abandoned by those courts that have addressed the issue."  *Rogers Fed. Deposit Ins. Corp. White Buffalo Dev., LLC v. FDIC*, No. 10-CV-011-D, 2011 WL 13112224, at *3-5 (D. Wyo. Jan. 27, 2011) (citing *Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 244 (D.C. Cir. 1995); *McMillian v. FDIC*, 81 F.3d 1041, 1046 (11th Cir. 1996); *Office and Professional Employees Int'l Union, Local 2 v. FDIC*, 27 F.3d 598, 601–02 (D.C. Cir. 1994)).

2017 because Lexon did not receive notice of nonrenewal from FNBC (due in January 2017), continuing Lexon's fixed and determined rights with respect to the irrevocable letters of credit as of that date. *See, e.g.*, Compl. ¶¶ 2, 16, 18-20.

Furthermore, pursuant to the protection feature of the irrevocable letters of credit, Lexon was entitled to draw on the irrevocable letters of credit at *any time* if, in its sole judgment, it concluded that a claim may be made under the Bonds and a draft was required for its protection. Compl. ¶¶ 16, 17.  If Lexon had known that FNBC began propping Linder up financially in 2016, Lexon would have concluded that it may receive a claim under the Bonds and the funds represented by a draft were required for its protection to ensure its collateral remained available. Compl. ¶¶ 20, 83.  This would ensure its maximum potential loss was limited to $1,117,800.00, the difference between the penal sum of the Bonds and the amount of the irrevocable letters of credit.

### 3. Because Lexon Is Not Limited to Damages Pursuant to 12 U.S.C. § 1821(e), All of Lexon's Damages Are Established Under the Irrevocable Letters of Credit

The FDIC contends that Lexon is not otherwise due any damages because the BOEM has not made any claims on the Bonds.  Mot. at 9-10.  In support of that argument the FDIC cites *Citibank (S. Dakota), N.A. v. FDIC*, 827 F. Supp. 789, 791 (D.D.C. 1993) which it contends establishes that damages must essentially be liquidated at the time of insolvency.  As explained above, that is not the case.  Moreover, as the excerpt from *Citibank (S. Dakota)* in the FDIC's brief makes clear, "the specific amount of the claim may be established later."  Mot. at 10.

The FDIC's damages position makes much out of whether BOEM has made a claim against the Bonds.  However, as the debtor in a Chapter 7 bankruptcy proceeding, Linder is out of business.  It is axiomatic that a bankrupt company will not, somehow, magically perform its plugging and abandonment obligation guaranteed by the subject bonds.  BOEM's eventual claim

against the Bonds, therefore, is inevitable.  Yet the FDIC has deprived Lexon of the more than $9 million in collateral it required as a condition of issuing the Bonds because it maintains that its improper repudiation of the irrevocable letters of credit was effective.[7]

Separately, because Lexon has established above that under the facts and circumstances alleged in the Complaint that the FDIC's repudiation was not within a reasonable period of time, 1821(e)'s provisions with respect to damages do not apply.  Therefore, when Lexon attempted to draw on the irrevocable letters of credit on December 1, 2017, the FDIC's failure to provide the funds damaged Lexon and constituted a breach of the irrevocable letters of credit subject to full contract damages.  *See NCB Mgmt. Servs., Inc.*, 843 F. Supp. 2d at 69–70; *Country Club Assocs. Ltd. P'ship v. FDIC*, 918 F. Supp. 429, 437 (D.D.C. 1996); Compl. ¶ 70.  Stated differently, according to the irrevocable letters of credit, the FDIC as receiver for FNBC should have already paid Lexon over $9 million.  However, because the FDIC maintains that its improper repudiation is effective, FNBC has paid absolutely nothing.  This constitutes damages by any standard.

Nor is what the FDIC as receiver may or may not have been entitled to be repaid under the irrevocable letters of credit relevant to the question of whether or not the FDIC complied

---

[7] Furthermore, the FDIC's position ignores the basic tenets of all such BOEM bonds.  As required by federal regulations concerning oil and gas operations in the Gulf, BOEM bonds must be payable on demand to the BOEM Regional Director.  *See* 30 C.F.R. § 556.902(a).  Once issued, these types of bonds cannot be cancelled except by replacing them with another such bond.  *See id.* at §§ 556.902(d), 556.906(a) ("Bonds must be non-cancellable, except as provided in § 556.906 of this part.").  The regulations further dictate that BOEM bonds "must continue in full force and effect even though an event occurs that could diminish, terminate, or cancel a surety obligation under State surety law."  *Id.*  The Bonds secure Linder's obligations to, among other things, plug and abandon all wells on its assets in the Gulf in accordance with federal regulations once they have reached the end of their usable life.  According to federal regulations, such plugging and abandonment obligations had already accrued by virtue of Linder's status as lessee and/or owner of operating rights on the various blocks in the Gulf of Mexico.  *See* 30 C.F.R. § 250.172 ("You accrue decommissioning obligations when you do any of the following: (d) are or become a lessee or the owner of operating rights of a lease on which there is a well that has not been permanently plugged according to this subpart").  Indeed, the Bonds included not only lease-specific bonds securing Linder's obligations on the West Cameron 168 lease block, but an area-wide bond for all of Linder's operations in the Gulf of Mexico.  *See* Compl., Ex. A.

with the terms of the irrevocable letters of credit.  Mot. at 10-11; *see* Compl., Ex. B ¶ 4.  The

FDIC did not honor Lexon's draw on the irrevocable letters of credit, made no payment, and

does not otherwise maintain that it is actually owed anything under the irrevocable letters of

credit.  Even if the FDIC were entitled to some repayment on the irrevocable letters of credit, and

it is not, any alleged claim that it would be owed repayment is additional support that the factual

record must be further developed, and the FDIC's motion should be denied.  *See NCB Mgmt.*

*Servs., Inc.*, 843 F. Supp. 2d at 69–70 ("Further, whether NCB is entitled to damages, and what

form those damages might take, are questions that turn on whether the FDIC properly exercised

its power of repudiation."); *Accardi Endeavors, LLC v. FDIC*, No. 8:10–cv–839–T–26EAJ, 2010

WL 3123085, at *4 (M.D. Fla. Aug. 9, 2010) (denying motion to dismiss because "the question

of reasonableness is a factual dispute best left for a determination on the merits at a different

stage in the proceedings").

> For the above reasons, the Court should deny the FDIC's Motion.

## POINT III

### LEXON'S THIRD CAUSE OF ACTION STATES A PLAUSIBLE CLAIM BECAUSE THE FDIC COULD NOT REPUDIATE THE IRREVOCABLE LETTERS OF CREDIT WHICH ARE NOT CONTRACTS

> The FDIC makes a lone, one sentence argument in opposition to Plaintiff's third cause of

action, explaining that "standby letters of credit are considered contracts for the purposes of

Section 1821(e) repudiation," even though the statute states nothing of the sort.  Mot. at 9.

> The FDIC supports its position by citing one case—*Credit Life Ins. Co. v. FDIC*, 870 F.

Supp. 417, 426 (D.N.H. 1993)—a twenty-five year old New Hampshire decision that proclaims a

letter of credit is a contract pursuant to Section 1821(e).  The basis for the court's decision does

not withstand scrutiny.  As the *Credit Life* court acknowledged at that time, whether a standby

letter of credit was a contract was an open question.  *Id.*  The linchpin of *Credit Life*'s support for its conclusion that a letter of credit was in fact a contract was UCC Article 5 on letters of credit, and specifically UCC § 5-114(1), which provided in official comment that "a 'letter of credit is essentially a contract between the issuer and the beneficiary . . . independent of the underlying contract between the customer and the beneficiary.'"  However, UCC Article 5 was revised two years after *Credit Life*, and the statement upon which *Credit Life* relies no longer exists.  Indeed, a comparison of the definition of "letter of credit" in the then-current UCC Article 5 with the revised Article 5, currently effective, shows that letters of credit are no longer referred to as contracts at all, but undertakings.  *Compare* UCC § 5-103(a)(1) (eff. through 1995) (providing letter of credit is an engagement that "may be either an *agreement* to honor or a statement that the bank or other person is authorized to honor" (emphasis added)), *with* UCC § 5-102(a)(10) (current) (providing letter of credit "means a definite *undertaking*" (emphasis added)) *and* Compl. ¶¶ 105-08 (same).  Nearly all of the cases cited in *Credit Life* suffer from this same defect.[8]

Thus, the FDIC's motion to dismiss Plaintiff's Complaint, with respect to the third cause of action, should be denied.

---

[8] One of the cases the *Credit Life* court cites in support of its conclusion is actually consistent with the revised definition of letters of credit, and many of the cases cited by *Credit Life* misinterpreted caselaw that stated clearly that a letter of credit was *not* a contract.  *Ward Petroleum Corp. v. FDIC*, for example, explained that the law governing the relationship between the issuer and beneficiary in a letter of credit is statutory, *not* contractual.  *See* 903 F.2d 1297, 1300 (10th Cir. 1990); *see also Bank of Cochin Ltd. v. Manufacturers Hanover Tr. Co.*, 612 F. Supp. 1533, 1537 (S.D.N.Y. 1985), *aff'd*, 808 F.2d 209 (2d Cir. 1986) ("*Not a contract*, the letter of credit has been best described as 'a relationship with no perfect analogies but nevertheless a well-defined set of rights and obligations.'" (emphasis added)).

## POINT IV

### THE FDIC DOES NOT OPPOSE LEXON'S SECOND OR FOURTH CAUSE OF ACTION AND THESE CLAIMS MUST PROCEED

Furthermore, the FDIC fails to oppose Plaintiff's second and fourth cause of action.  The FDIC does not move to dismiss Plaintiff's claim that the FDIC approved the irrevocable letters of credit and is thus required to treat Lexon's claim as an administrative expense.  Compl. ¶¶ 88-97.  *See generally* 12 U.S.C. §§ 1821(d)(11)(A)(i), 1821(d)(20).  Nor does the FDIC move to dismiss Plaintiff's claim that the FDIC repudiated a three-party arrangement and thereafter retained all of the benefits without performance thereunder as FNBC's successor-in-interest.  Compl. ¶¶ 111-21; *see All Serv. Exportacao, Importacao Comercio, S.A. v. Banco Bamerindus Do Brazil, S.A., New York Branch*, 921 F.2d 32, 34 (2d Cir. 1990) ("Generally, letters of credit are designed to substitute for, and therefore support, an obligation to pay.  They involve three separate, but related, contracts—the underlying sales contract between a buyer and a seller; the agreement between an issuing bank and its customer, the buyer, by which the bank agrees to issue a letter of credit; and the letter of credit itself, which is the Bank's commitment to pay the beneficiary, the seller, upon compliance with terms and conditions specified in the letter of credit.").

As such, the second and fourth causes of action should proceed regardless of how the Court is inclined to resolve the FDIC's motion to dismiss the first and third causes of action.[9]

---

[9] To the extent Defendants raise new arguments in their reply brief not raised in their original memorandum of law in support of their motion to dismiss, Lexon reserves the right to move this Court for leave to file a surreply.

## CONCLUSION

For all the foregoing reasons, the Court should deny the FDIC's Motion to Dismiss and grant such other and further relief as it may deem just and proper.

Dated:  July 17, 2018

Respectfully submitted,

**LOCKE LORD LLP**

*/s/ Omer F. Kuebel, III*

Omer F. Kuebel, III (LA #21682)
Jason Cerise (LA #28526)
LOCKE LORD LLP
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130
Telephone: (504) 558-5155
Facsimile: (504) 558-5200
rkuebel@lockelord.com
jcerise@lockelord.com

Alicia F. Castro
  Texas Bar No. 24069705
    (a*dmitted Pro Hac Vice*)
LOCKE LORD LLP
600 Travis Street, Suite 2800
Houston, Texas 77002
Telephone: (713) 226-1266
Facsimile: (713) 229-2609
acastro@lockelord.com

*and*

**HARRIS BEACH PLLC**

Dale A. Worrall
  New York Atty No. 2791309
    (a*dmitted Pro Hac Vice*)
Daniel E. Guzmán
  New York Atty No. 4985008
    (a*dmitted Pro Hac Vice*)
HARRIS BEACH PLLC
99 Garnsey Road
Pittsford, New York 14534
Telephone: (585) 419-8620
dworrall@harrisbeach.com
Telephone: (585) 419-8979
dguzman@harrisbeach.com

and

Lee E. Woodard, Esq.
  New York Atty No. 1845304
    (a*dmitted Pro Hac Vice*)
HARRIS BEACH PLLC
333 W. Washington St., Ste. 200
Syracuse, New York 13202
Telephone: (315) 423-7100
Facsimile:  (315) 422-9331
lwoodard@harrisbeach.com

**ATTORNEYS FOR PLAINTIFF,
LEXON INSURANCE COMPANY, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of July 2018, a true and correct copy of the foregoing document was served on all counsel of record via electronic mail using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to any non-CM/ECF participants.

*/s/ Omer F. Kuebel, III*
Omer F. Kuebel, III

21

America 69648820v.3